731 F.2d 1272
 Blue Sky L. Rep. P 72,046, Fed. Sec. L. Rep. P 91,422
Arthur R. GIERINGER; A. John Gieringer; Arthur R.
Gieringer as Trustee for Dorothy A. Weiler; Arthur R.
Gieringer and A. John Gieringer as Representatives of all
Minority Shareholders of Vilter Manufacturing Corporation;
and Arthur R. Gieringer and A. John Gieringer as
Shareholders on behalf of Vilter Manufacturing Corporation,
Plaintiffs-Appellants, Cross-Appellees,
v.
A.A. SILVERMAN; E.J. Kocher; Leo V. Ryan; Norma Loos, as
Personal Representative of the Estate of Ludwig E. Loos;
A.O. Vogel; E.I. Van Housen; W.I. Grant; Norma Loos;
Louise E. Fridl; Duff & Phelps, Inc., an Illinois
corporation; Vilter Employees' Profit Sharing Plan Trust;
and Vilter Manufacturing Corporation, Defendants-Appellees,
Cross-Appellants.
 Nos. 82-1980, 83-1792.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 8, 1983.
Decided April 12, 1984.
 
 Miriam F. Miquelon, Miquelon, Cotter & Daniel, Ltd., Chicago, Ill., for plaintiffs-appellants, cross-appellees.
 Joseph E. Coughlin, Lord, Bissell & Brook, Chicago, Ill., David J. Hase, Foley & Lardner, David Cross, Quarles & Brady, Milwaukee, Wis., for defendants-appellees, cross-appellants.
 Before PELL, WOOD and POSNER, Circuit Judges.
 PELL, Circuit Judge.
 
 
 1
 Arthur R. Gieringer and A. John Gieringer, father and son, appeal from the district court decision that granted summary judgment in favor of the defendants, various officers and directors of the Vilter Manufacturing Corporation (Vilter). The defendants cross-appeal from the district court's denial of their request for attorney's fees. The principal issue raised by the Gieringers is whether a motion for summary judgment is an appropriate vehicle for the resolution of a statute of limitations defense when the due diligence of the plaintiffs is in issue and the plaintiffs have filed a Rule 56(f) motion in response to the defendants' motions for summary judgment. Due to the procedural posture of this case, we must view the facts in the light most favorable to the plaintiffs. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).
 
 I. THE FACTS
 
 2
 On September 28, 1979, Vilter made a redemption offer for its own shares of stock. The redemption offer arose because certain senior officers of the corporation sought to liquidate their securities holdings of 87,500 shares. Prior to the redemption offer, the total number of Vilter shares outstanding was 426,427. While the previous bid price for Vilter shares had never exceeded $34 per share, the corporation decided to repurchase the shares held by the executives at $40 per share. Vilter extended the $40 redemption price to all outstanding shareholders and stood ready to buy back all the outstanding shares. The other inside shareholders--the president and vice president of Vilter--indicated their intention to retain their shares. The corporation made no recommendation in its letter offer to the shareholders either to tender or to refrain from tendering their shares. If the minority shareholders tendered more than 41,000 shares of the 176,000 shares not owned by corporate insiders, the resultant reduction in the number of shares outstanding would leave the president and vice president and the profit sharing trust that they controlled with more than half of all remaining shares.
 
 
 3
 The offer letter contained a variety of legal and financial information. The letter indicated that Wisconsin law provides for no dissenting shareholder rights in transactions of this type. The letter also revealed that Vilter had hired Duff & Phelps, Inc. (D & P), an independent Chicago firm of investment and financial analysts, to consider whether the $40 per share price was adequate. The offer letter stated that D & P had concluded that the price was fair to minority shareholders. Although Vilter did not submit the D & P report to the shareholders with the offer letter, it made the report available for inspection and copying at its offices.
 
 
 4
 The offer letter went on to note that Vilter had incurred a substantial indebtedness to obtain the funds necessary for the redemption and that those loans would have a negative impact upon future dividends. The letter then related the conditions of the over-the-counter market for Vilter shares. It noted that the market had not been active and that there had been no recent asked prices, though the most recent bid price was $34 per share. The letter cautioned that the tender of a substantial number of shares could have significant market consequences. For instance, all other things being equal, with a substantial tender, there would be an increase in the per share income of the firm. At the same time, however, the letter warned that such a tender might make it difficult for a shareholder to sell his shares at a later date for a price that he deemed reasonable. In other words, the market for Vilter shares might evaporate. The letter also stated that, if shareholders tendered 108,200 of the shares not held by corporate insiders, then the remaining inside shareholders would be able to act without the concurrence of remaining minority shareholders. Finally, the offer letter noted that the expiration date for the redemption was October 23, 1979.
 
 
 5
 The plaintiffs received and reviewed the letter offer before the expiration date of the offer. Subsequently, they consulted with counsel from December 1979 through October 1980. On November 4, 1980, the plaintiffs sent demand letters to the defendants in an attempt to obtain compensation for the losses and damages that the plaintiffs sustained as a result of the redemption offering. Correspondence ensued. Finally, after the defendants refused to comply with the plaintiffs' demands, the plaintiffs filed this action on July 21, 1981. The complaint contained fourteen claims. Eight claims alleged violations of federal securities law. Sec. 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and Rule 10b-5, 17 C.F.R. Sec. 240.10b-5. Claim nine alleged violations of Wisconsin securities laws. Wis.Stats. Sec. 551.42(3), .59(3) (1975). The remaining five claims alleged breaches of fiduciary duties by the controlling shareholders.
 
 
 6
 One of the original defendants, M & I Marshall & Ilsley Bank, filed a motion to dismiss based upon statute of limitations grounds. The district court granted the motion in October 1981. The other defendants filed answers to the complaint and then deposed both plaintiffs in late August 1981. In response to the plaintiffs' requests for production of documents, the defendants for the most part responded with various objections. In November 1981, all remaining defendants filed motions for summary judgment, based principally upon statute of limitations grounds. Thereafter, their counsel refused to produce either the documents requested or the defendants for deposition. The plaintiffs filed several motions to compel discovery and, subsequently, filed motions to continue the defendants' motions for summary judgment to permit further discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. There was extensive briefing on the Rule 56(f) motions, but the court never explicitly set a briefing schedule on the defendants' motions for summary judgment. In a decision and order promulgated on May 20, 1982, the trial judge denied the plaintiffs' Rule 56(f) motion and, finding that no additional discovery was required, granted the defendants' motions for summary judgment with prejudice as to the federal claims and without prejudice as to the pendent state claims. 539 F.Supp. 498 (E.D.Wis.1982). The plaintiffs appealed.
 
 II. THE DISTRICT COURT OPINION
 
 7
 The district court applied the undisputedly applicable state statute of limitations to the plaintiffs' state and federal securities claims. That provision states: "No action shall be maintained under this section unless commenced before the expiration of 3 years after the act or transaction constituting the violation or the expiration of one year after the discovery of the facts constituting the violation, whichever first expires ...." Wis.Stats. Sec. 551.59(5). Because the plaintiffs filed suit in July 1981, the suit is well within three years of the September 1979 offer letter. Consequently, the court had to determine when the plaintiffs discovered the facts constituting the violation. From the date of that discovery, the plaintiffs had one year in which to bring their suit.
 
 
 8
 The defendants submitted transcripts of the plaintiffs' depositions in support of their motions for summary judgment. The court relied upon those depositions as well as the exhibits attached to the plaintiffs' complaint, including the offer letter, to determine when the plaintiffs obtained sufficient information to begin the running of the statute of limitations. Both plaintiffs testified at their depositions that they received the offer letter within one week of its issuance and that they immediately knew that the price was too low. The court reiterated that the offer stated that future dividends would suffer because of the redemption, that the marketability of minority-held Vilter stock might decline, and that the majority might achieve absolute control of the corporation's future if a sufficient number of shares were tendered. The elder Gieringer testified that, upon receipt of the offer, he immediately called his accountant and several lawyers to determine how he should proceed. As a result of the record before him, the trial judge concluded:
 
 
 9
 [T]here is no question but that the plaintiffs knew on receipt of the tender offer that the price offered was unjust and merited further investigation, even if they did not know all of the details of the supposed scheme of the controlling shareholders. The law does not require full knowledge of a scheme or its consequences. It requires only sufficient knowledge to put a reasonable person on notice of the need for diligent investigation....
 
 
 10
 In sum, [Wis.Stats.] Sec. 551.59(5) does not allow a year to file suit after the conclusion of a diligent investigation. It allows a year in total in which to make such investigation after receipt of sufficient information to put a party on notice of possible fraud and to commence legal proceedings. In light of the information revealed on the face of the tender offer and the plaintiffs' immediate suspicions, their year began to run on receipt of the September 28, 1979 offer. They did not file suit until July 21, 1981, and their suit therefore is barred.
 
 
 11
 539 F.Supp. at 502. The court then went on to dismiss the plaintiffs' contentions that the doctrine of equitable tolling applies, that settlement negotiations that begin after more than a year estop the defendants to raise the statute of limitations defense, and that they needed further discovery before the court could rule on the summary judgment motions.
 
 III. THE APPEAL
 
 12
 On appeal, the plaintiffs first allege that it is improper to dispose of statute of limitations issues in securities cases by summary judgment. Our case law demonstrates conclusively that there is no such procedural impediment to the granting of summary judgment. In a number of securities cases where the motive and intent of the defendants was in issue, courts within this circuit have held that summary judgment was inappropriate. See, e.g., Staren v. American National Bank & Trust Co., 529 F.2d 1257, 1261 (7th Cir.1976); Tomera v. Galt, 511 F.2d 504, 510 (7th Cir.1975); Kramer v. Loewi & Co., 357 F.Supp. 83, 88 (E.D.Wis.1973). The explanation for these holdings lies not in the fact that the complaints alleged securities violations but in the realization that issues of the defendants' motive and intent cannot be determined prior to complete discovery and, in most instances, a trial on the merits. On the other hand, the issue of the plaintiffs' due diligence in discovering facts underlying a securities claim is, under certain circumstances, amenable to disposition by summary judgment. Turner v. First Wisconsin Mortgage Trust, 454 F.Supp. 899, 907 (E.D.Wis.1978); Cahill v. Ernst & Ernst, 448 F.Supp. 84, 88 (E.D.Wis.), vacated, 588 F.2d 835 (7th Cir.1978), on remand, 478 F.Supp. 1186, 1191 (E.D.Wis.1979), affirmed, 625 F.2d 151 (7th Cir.1980). See also Ohio v. Peterson, Lowry, Rall, Barber & Ross, 472 F.Supp. 402, 410 (D.Colo.1979), affirmed, 651 F.2d 687 (10th Cir.1981) (collected cases at 692 n. 9), cert. denied, 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209. According to the court below, the dispositive factor in the statute of limitations controversy was the state of mind of the plaintiffs. If we uphold the district court's opinion with respect to the expiration of the statute of limitations, therefore, the defendants' motive and intent are irrelevant, overcoming the often restricted availability of summary judgment in securities cases.
 
 
 13
 Having decided that summary judgment is available to the defendants in this case, we come then to the question of whether the district court erred when it granted summary judgment to the defendants based upon the plaintiffs' deposition testimony. Under the federal gloss to the Wisconsin statute of limitations developed to determine the commencement of the limitations period, the applicable one-year period begins to run as of the date the plaintiff knows or, in the exercise of due diligence, should know of facts sufficient to put them on notice that a fraud had occurred. Cahill v. Ernst & Ernst, 448 F.Supp. at 87. That the plaintiffs now claim that they did not discover the "full enormity" of the alleged fraud until later does not delay the beginning of the one-year limitations period. Klein v. Bower, 421 F.2d 338, 343 (2d Cir.1970). As the district court correctly noted, 539 F.Supp. at 502, the running of the statute of limitations does "not await appellant's leisurely discovery of the full details of the alleged scheme." Klein v. Bower, 421 F.2d at 343 (quoted with approval in Turner v. First Wisconsin Mortgage Trust, 454 F.Supp. at 906).
 
 
 14
 The principal complaint of the plaintiffs is that they never had an opportunity to conduct discovery. After both plaintiffs gave their depositions, it is true that their own discovery yielded only very few documents, objections to further production, and refusals by the defendants to allow the plaintiffs to depose them, pending resolution of the motions for summary judgment. Yet, in all the briefing before this court and the court below, the plaintiffs have failed to indicate how further discovery that they might conduct could elicit evidence that would enable them to resist summary judgment. This is not a case where the facts necessary to defeat summary judgment were in the hands of the movants, here the defendants. Cf. Costlow v. United States, 552 F.2d 560, 564 (3d Cir.1977) (reversing summary judgment in Federal Tort Claims Act case). The plaintiffs were the only people who would possibly be in possession of information sufficient to counter the inferences of a lack of due diligence found in their depositions. They did not need further discovery to achieve that purpose.
 
 
 15
 The plaintiffs allege in their briefs that they needed discovery to establish the factual predicate for the theory of equitable tolling and to show that the defendants were estopped to assert the statute of limitations. The plaintiffs fundamentally misconstrue the nature of these two doctrines. Under the theory of equitable tolling, a statute of limitations does not begin to run because some fraudulent action by the defendant, subsequent to the initial wrong, has prevented the claimant from discovering the initial wrong. Schaefer v. First National Bank, 509 F.2d 1287, 1296 (7th Cir.1975), cert. denied, 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976). In the present case, the plaintiffs never alleged that the defendants took any fraudulent action, after the alleged initial fraud, that prevented them from discovering that wrong. Cf. id. (specific allegations of fraudulent concealment require reversal of trial court's grant of summary judgment on statute of limitations grounds).
 
 
 16
 More fundamentally, under this branch of the equitable tolling doctrine,[1] concern with fraudulent concealment would not arise until after the statutory period of limitations expired. Section 551.59(5) has a three-year limitations period unless a plaintiff knows or should know facts sufficient to put him on notice of the defendant's misconduct. If a defendant has fraudulently concealed his actions, then the one-year limitations period would not apply at all, for a complainant cannot know about a fraud that has been fraudulently concealed from him. Trecker v. Scag, 679 F.2d 703, 706 n. 7 (7th Cir.1982). In the present case, however, the plaintiffs have admitted that they knew that the price proposed by the offer letter was inadequate immediately upon receipt of the offer. If that knowledge is enough to commence the running of the one-year period, as the lower court decided and the issue to which we soon will turn, then the doctrine of fraudulent concealment is unavailable to the plaintiffs. Consequently, further discovery to establish the factual requisites for a claim of fraudulent concealment would be futile.
 
 
 17
 The plaintiffs also claim that further discovery would show facts sufficient to establish equitable estoppel. Under the doctrine of equitable estoppel, a defendant is estopped to assert the statute of limitations if actions by him have caused a plaintiff to fail to file his complaint within the prescribed period. Bomba v. Belvidere, Inc., 579 F.2d 1067 (7th Cir.1978). The factor that most frequently leads a court to invoke the doctrine of equitable estoppel is the presence of settlement negotiations. Thus, in the present case, the plaintiffs allege that settlement negotiations should preclude the defendants from asserting the statute of limitations. Without deciding whether the communications between the parties constitute "negotiations" for the purposes of the estoppel rule, and accepting the plaintiffs' assertion that negotiations began on November 4, 1980, equitable estoppel still cannot operate to preclude summary judgment on statute of limitations grounds in this case. The lower court determined that the statute of limitations began to run upon receipt of the letter offer. In their depositions, the plaintiffs testified that they received the letter offer within one week of its issuance on September 28, 1979, which would be October 5 at the latest. Consequently, if the district court was correct in ruling that the statute of limitations began to run upon receipt of the offer, the limitations period expired by October 5, 1980, one month before the commencement of any negotiations.
 
 
 18
 The plaintiffs also make indefinite claims in their briefs that further discovery would demonstrate that they had exercised due diligence in pursuit of their legal claims. We have previously faced a similar scenario in Hupp v. Gray, 500 F.2d 993 (7th Cir.1974). In Hupp, the district court granted the defendants' motion to dismiss on statute of limitations grounds on the basis of the pleadings and the plaintiff's deposition testimony. In affirming the summary disposition of the plaintiff's claim, this court noted: "[I]n neither the complaint ... nor the deposition did the plaintiff indicate by way of fleshing out the allegations of diligence any actual steps which he had taken ... to discover the true facts ...." Id. at 996. Similarly, the plaintiffs in the case now before us did not indicate in their complaint, depositions, or Rule 56 submissions how they exercised due diligence.
 
 
 19
 The plaintiffs presented below and reallege here a litany of factors intended to show that they pursued their remedies with all due haste, but they failed to support their assertions in either their complaint or their depositions by showing steps they took to discover the facts. Most of the events alleged by the plaintiffs to establish due diligence occurred after November 4, 1980, and therefore come too late to save the plaintiffs from summary judgment, as shown above. As to the events before that date, only two mention any action undertaken by the plaintiffs; consequently, only those events could possibly establish due diligence. First, the plaintiffs allege that they did not receive the Duff & Phelps Valuation Report with the letter offer, which explicitly referred to the Report. In fact, they state that they did not receive the Report until January 1981. Far from aiding the plaintiffs in their attempt to establish due diligence, this fact highlights the failure of diligence by the plaintiffs, for the letter offer explicitly stated that Vilter shareholders could obtain a copy of the Report upon request. There is no indication that the plaintiffs ever requested the Report before 1981, a fact peculiarly within their own power to show.
 
 
 20
 Second, the plaintiffs allege that they retained counsel in December 1979 and that this fact somehow tends to establish their diligence. Again, if relevant at all, this fact tends to support the district court's conclusion that the plaintiffs had knowledge of the alleged violation upon receipt of the letter offer because they mention no intervening event that caused them to suspect that the defendants had violated their rights. Furthermore, by the plaintiffs' own admissions, they knew upon receipt of the offer, which was within one week of its issuance on September 28, 1979, that the price was inadequate. They immediately consulted their accountant who told them, before the offer expired on October 23, 1979, that the offer was good for the company but not so good for the shareholders. They then consulted with their usual attorney, who was unable to represent them due to a conflict of interest. By early December 1979, they had hired the lawyers who represented them in this case. Then, fatally to their claim, they waited before filing suit. The record reveals that they even acquired more shares of Vilter stock at market prices to put themselves in a better position if they could force the defendants into settling their claim. Crucially, however, they failed to file their claim for over twenty months and did not initiate the first overtures about settlement until thirteen months after the receipt of the offer. The facts are undisputed and insusceptible to conflicting inferences. Hupp v. Gray, 500 F.2d at 997. Thus, the district court correctly ruled that the plaintiffs' claim was barred by the one-year statute of limitations in section 551.59(5).
 
 
 21
 The plaintiffs further allege that they never had an opportunity to respond formally to the defendants' motions for summary judgment. Although the plaintiffs labeled all their submissions to the district court as being pursuant to their own Rule 56(f) motion and included statements to the effect that they did not intend the filings to be taken as their response to the defendants' motions, the substance of those submissions clearly addressed the merits of the summary judgment issue. Furthermore, the defendants' motions were pending before the district court for over six months, which gave the plaintiffs more than ample opportunity to respond. Thus, we do not face a situation like the one addressed by this court in Indiana Port Commission v. Bethlehem Steel Corp., 702 F.2d 107 (7th Cir.1983). In that case, we reversed the grant of summary judgment because the district judge ignored the briefing schedule he had previously set, effectively precluding Bethlehem from responding to the summary judgment motion and leaving it with "no opportunity to point out the apparent factual controversies in this case which may well preclude a proper grant of summary judgment." Id. at 111. Here, the plaintiffs had ample opportunity to delineate where the factual controversies were. In fact, the plaintiffs availed themselves of that opportunity, albeit in the guise of their Rule 56(f) motion. They listed facts that they thought were controverted. The district court concluded, however, that none of those facts, even if established, could negate the evidence of knowledge of the alleged fraud established by the plaintiffs' depositions. Therefore, irrespective of the trial judge's ruling on the merits of the statute of limitations issue, the plaintiffs' objection that they were not on notice that the trial judge would decide the summary judgment issue is completely meritless.
 
 
 22
 In effect, the plaintiffs contend that the mere filing of a Rule 56(f) motion should stay automatically the proceedings on the underlying motion for summary judgment. There is no basis for this contention either in the language of the rule or in the case law. As long as the district court had not disposed of the Rule 56(f) motion, the plaintiffs should have known that the pending summary judgment motions were amenable to disposition. The plaintiffs had every opportunity to respond directly to the defendants' motions but failed to avail themselves of that opportunity. Although they did allege that their Rule 56(f) papers were not responsive to the summary judgment issues, the defendants noted in one of their briefs to the district court that they considered the issues on summary judgment to be ready for decision. The plaintiffs did not object to the defendants' characterization in their reply to that brief. Therefore, the district court rightly concluded that the motions were adjudicable.
 
 
 23
 Furthermore, even had the plaintiffs objected to the procedure, the district court would have been correct in reaching the merits of the summary judgment issues. The plaintiffs failed to submit any countervailing affidavits to respond to the defendants' motions, which were based upon the plaintiffs' own deposition testimony. Nor in their Rule 56(f) submissions did the plaintiffs indicate how any further discovery would alter that testimony. Therefore, since the district court was correct in holding that summary judgment was proper, it was also correct in disposing of the motions for summary judgment as it did; any objection to the procedure employed is unavailing. We have considered all the other arguments raised by the plaintiffs and find them to be without merit.[2] Accordingly, we affirm the district court's grant of summary judgment in favor of the defendants.
 
 IV. ATTORNEY'S FEES
 
 24
 In a separate decision and order entered after the decision on the merits, the district court denied the defendants' motion for taxation of attorney's fees. The defendants have appealed from the district judge's ruling. They allege that the plaintiffs' claims were entirely without color and legal basis. The defendants characterize the plaintiffs' suit as a classic strike suit, brought to harass the defendants into settlement despite the fact that the plaintiffs' claims were meritless. Therefore, the defendants claim, they deserve an award of attorney's fees under both Rule 11 of the Federal Rules of Civil Procedure and the bad faith exception to the American rule against such awards. See generally Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 258-59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975); F.D. Rich Co. v. Industrial Lumber Co., 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974).
 
 
 25
 The standard of review when a party appeals the denial of attorney's fees is a very limited one. As we have recently stated, "the denial of attorneys' fees in general is a matter for the sound discretion of the trial judge ...." Badillo v. Central Steel & Wire Co., 717 F.2d 1160, 1163 (7th Cir.1983) (citing Harrington v. DeVito, 656 F.2d 264, 266 (7th Cir.1981), cert. denied, 455 U.S. 993, 102 S.Ct. 1621, 71 L.Ed.2d 854 (1982)).
 
 
 26
 The procedural setting of Badillo, a job discrimination suit, is somewhat similar to the case now before us. The district court there struck a number of the plaintiff's claims, which were then realleged in altered form and then restruck. The plaintiff's deposition testimony contradicted almost all of his individual claims. His counsel once failed to examine documents produced pursuant to his request and later failed to respond to interrogatories. In response to the defendant's motion for summary judgment, Badillo filed only a short legal memorandum and no counter-affidavits. In short, the conduct in that case was substantially more egregious than the conduct in the present case. Nonetheless, when the district court granted the defendant's motion for summary judgment, it denied the defendant's application for fees. We affirmed that denial. Under the "bad faith" exception, we noted the stringent standard that a party moving for fees must satisfy. See 717 F.2d at 1165, and authorities cited therein. We concluded that there was no element of subjective bad faith demonstrated and, therefore, that we should not reverse the denial of attorney's fees on the basis of the bad faith exception. Under Rule 11, a willful violation of the rule against bad faith pleadings may subject an attorney to discipline, including the taxation of fees against the attorney. We held, however, that the denial of fees was proper because there was no "showing of subjective bad faith on the part of Badillo's counsel." Id. at 1167 (emphasis in original). See also McCandless v. Great Atlantic & Pacific Tea Co., 697 F.2d 198, 200 (7th Cir.1983).
 
 
 27
 In the present case, the defendants' primary claim of bad faith rests in the plaintiffs' statements in their depositions, which seemed to indicate that their purpose in bringing suit was to obtain a settlement. There are also claims that the legal theories propounded in the complaint and subsequent briefs are so obviously lacking in merit that fees should follow. We agree with the conclusion of the district court on this issue:
 
 
 28
 Without deciding whether the Gieringers instituted this action for reasons of harassment or other improper motive, I hold that the motions for taxation of attorneys' fees must be denied because the defendants have not and indeed cannot adduce clear evidence that when the suit was commenced the claims advanced were entirely without color.
 
 
 29
 Slip op. at 3. Accordingly, we refuse to reverse the trial court's exercise of its discretion in denying attorney's fees. The complex questions raised by the statute of limitations issue demonstrate the colorability of the plaintiffs' complaint and preclude an award of fees against the plaintiffs' attorneys under Rule 11. It was also not incorrect for the trial judge to refuse to award fees against the plaintiffs personally, pursuant to the bad faith exception. The mere fact that the plaintiffs hoped that their suit would result in payment to them of a price-per-share far in excess of that propounded in the letter offer does not establish subjective bad faith in pursuing the legal claims advanced in this suit. Consequently, we affirm the district court's denial of the defendants' motion for taxation of attorney's fees.
 
 V. CONCLUSION
 
 30
 The decisions and orders of the district court are, in all respects,
 
 
 31
 AFFIRMED.
 
 
 
 [1]
 The second type of fraudulent concealment often identified in our cases, see Tomera v. Galt, 511 F.2d at 510, turns on the question of due diligence by the plaintiff. Wisconsin's statute of limitations eliminates this form of fraudulent concealment as an independent doctrine by providing for a bifurcated limitations period. That is, the one-year provision of the statute of limitations subsumes the due diligence prong of the fraudulent concealment doctrine
 
 
 [2]
 The defendants on appeal also argued that the judgment should be affirmed because of lack of standing on the part of the plaintiffs, they being neither buyers nor sellers. While we entertain serious doubt, as did the district court, that plaintiffs had standing to bring these securities actions, we do not need to reach this issue